ELSBERRY DRAINAGE DISTRICT v. LOTTIE
PATTON HARRIS et al., Appellants.
ELSBERRY DRAINAGE DISTRICT, Appellant, v.
LOTTIE PATTON HARRIS, W. A. RICHARDS,
CARSON E. JAMISON et al.

Division One, February 29, 1916.

1. **DRAINAGE DISTRICT: Care in Procedure.** The statutes providing for the reclamation of waste lands necessarily involve such radical interference with the owner's control of his property and such a liberal exercise of the taxing power, as to call for the utmost care in their preparation and execution.

2. ————: **Jurisdiction: Notice: Personal Service.** The jurisdiction of the circuit court to extend the boundary lines of an existing drainage district, under the Act of 1913, is not dependent upon personal service upon resident owners of the land to be included. Neither the Constitution of Missouri nor of the United States requires a uniform method of obtaining jurisdiction of the persons of litigants, in either general or special proceedings. A notice by publication in the language of the statute "to all persons interested," is sufficient.

3. ————: **Right to Extend Boundaries: Must be Shown by Record: Judicial Notice.** The right of a drainage district to extend its boundaries so as to include other lands subject to overflow must be found in the record at the trial. Its mere corporate existence does not prove its cause of action in such case. The court cannot take judicial notice of its original plan of reclamation and all proceedings of the company connected therewith.

4. ————: **Inclusion of Other Lands Not Benefited.** The statutes do not authorize an organized drainage district to so extend its boundaries as to include within the district other lands which do not need reclamation and protection from water. Unless they are beneficially affected and there is some common interest between them and those of the existing district, they cannot be included against the will and protest of their owners. A drainage district can neither go outside the object of its organization to force upon owners of adjoining land an improvement in which they have no interest, nor compel such owners to improve the land without receiving some benefit to compensate them for the outlay.

5. ———: ———: **Lands Subject to Overflow.** Notwithstanding that at the time a drainage district was organized it could include only "swamp and overflowed lands," and subsequently the statute was so changed as to permit the inclusion also of lands "subject to overflow," an attempt by it, after the change in the law, by way of extending its boundaries, to surround sixty-five hundred acres of land, disconnected from that for the improvement of which it was organized, with a levee so high and strong as to render its own land immune from the effects of a repetition of a flood which occurred more than fifty-five years ago, when it last overflowed, and, by a complicated plan of drainage, to turn loose into its own ditches, to be enlarged for the purpose, all the surplus water which may accumulate in the vast area, and after it has been carried twelve miles through the ditch, to pump it into the Mississippi River, there being no showing that the land thus surrounded would be benefited and its owners exhibiting no desire to join in it, cannot be looked upon with judicial favor.

6. ———: **To Aid Private Enterprises.** A drainage district has no power to levy taxes to aid a purely private enterprise. Where the plan of reclamation of land which it is proposed to include in a drainage district by an extension of its boundaries, is the plan agreed upon by a contract between the district engineer and the owner of a part of the land, by which that part was to be admitted to the benefits of the improvement and the cost to be charged against it was to be limited to a designated amount, the balance and principal amount to be charged against the remaining lands to be included against the will of its owners, the extension instituted for the purpose of consummating that contract should not be allowed.

Appeal from Lincoln Circuit Court.—*Hon. E. B. Woolfolk*, Judge.

For judgment, see *post*, page 162.

*J. D. Hostetter* and *Avery, Young, Dudley & Killam* for plaintiff.

(1) The Drainage Act of 1913 is constitutional notwithstanding it only provides for notice by publication. The proceeding is not one to take anybody's land or property, but is a proceeding to establish a public corporation for reclamation purposes, and no notice at all is necessary in order to constitute due pro-

cess of law.  State ex rel. v. Blair, 245 Mo. 293; Drainage District v. Campbell, 154 Mo. 156; Land & Stock Co. v. Miller, 170 Mo. 259; Levee Co. v. Hardin, 27 Mo. 495; Levee Co. v. Meier, 39 Mo. 57; Drainage District v. Railroad, 236 Mo. 109; Barnes v. Construction Co., 257 Mo. 175.  (2) . The statute does not limit the extension of the boundaries to a single extension.  There is no reason in the nature of the thing why there should be such limit and there is abundant reason why the benefits of reclamation should not be so restricted that one extension is all that can be had.  Laws 1913, p. 254, sec. 40.  Nor does the fact, if it were a fact, that the land owners in the territory did not initiate or ask for the extension, affect the power to extend the boundaries.  The statute expressly confers power on the district, through its supervisors, to inaugurate the proceedings.  (3) The assertion that the land is not wet, swamp or overflow land finds its overwhelming refutation in the evidence in the case.  And further, by the fact that the right to include any particular tract or tracts of land does not depend, as a matter of law, entirely upon the character of the land.  Little River Drainage District v. Railroad, 236 Mo. 107.  (4) The Drainage Act very clearly provides that the thing that shall be tried is the "objections" of the defendant.  On the objections of the defendant in this case, no issue arose as to the incorporation of the Elsberry Drainage District.  The court takes judicial notice of its own records in these cases, in fact, in all cases.  Besides, it is alleged in the petition that the defendant is a drainage corporation under the laws of this State, and there is no denial under oath as required by statute.

*F. J. Duvall* and *Pearson & Pearson* for defendants.

(1)  Both the Constitution of the United States, and the Constitution of Missouri prohibits the de-

priving of any person of life, liberty or property without due process of law. Art. 2, sec. 30, Constitution. The notice by publication is not due process of law, within the meaning of either Constitution. In re Strom's Est., 134 Mo. App. 347; Gardner v. Robertson, 208 Mo. 610; Hunt v. Searcy, 167 Mo. 178; Dulaney v. K. C. Police Ct., 167 Mo. 678; Turner v. Gregory, 151 Mo. 103; Bardwell v. Collins, 20 Am. St. 547, 44 Minn. 97. It must be by personal service. It is not sufficient that the defendant has actual knowledge that the suit is pending; he is entitled to service of the writ in one or the other of the modes pointed out by the statutes. Bank v. Kingston, 204 Mo. 700; Blickensderfer v. Hanna, 231 Mo. 108; Ohlman v. Saw Mill Co., 222 Mo. 66; Shuck v. Moore, 232 Mo. 656; Stanton v. Thompson, 234 Mo. 11; Chilton v. Tamm, 235 Mo. 502; Walter v. Schofield, 167 Mo. 554; State ex. rel. v. Field, 107 Mo. 451. The law required personal service in all such drainage proceedings, until this enactment of 1913. Sec. 5500, R. S. 1909. (2) The petition does not state facts sufficient to constitute a cause of action, against these objectors. First: It nowhere states that the land of these objectors sought to be annexed, is a contiguous body of wet, swamp or overflowed lands. Sec. 2, p. 233, Laws 1913. Second: This being a petition for an extension of the boundaries of a district already incorporated and organized, to give petitioner the right to extend its boundaries, it must state in its petition some specific necessity for the annexation of the land sought to be annexed or incorporated in the district. There must be facts stated in the petition, showing what the necessity is. The law does not give a drainage district authority to extend its boundaries to take in lands for the sole purpose of improving those lands, according to the individual opinions of the supervisors of a district. Drainage District v. Turney, 235 Mo. 80. Third: The

petition does not state, and there was no proof of the fact, that the Elsberry Drainage District was ever incorporated in Lincoln County, or anywhere else. This is not such a corporation, that the court can take judicial knowledge of its incorporation, or its existence. Fourth: The petition fails to state that it is seeking this extension, at the instance, or upon the request of any owners of lands, sought to be attached to the district. Fifth: The petition does not state facts sufficient to show, that no other extension of the boundaries has been sought by Elsberry Drainage District. Sec. 40, p. 254, Laws 1913, grants to a drainage district the privilege of making only one extension. Drainage District v. Turney, 235 Mo. 95. (3) There is absolutely no legal, competent, evidence upon which to base the finding and judgment of the court, as to objectors' land. (a) There is no evidence that objectors' land was a contiguous body of wet, swamp or overflowed lands. (b) There was no evidence, showing a necessity, or what that necessity is for extending these boundaries. (c) There was absolutely no testimony, that the completion of the district as contemplated, without the annexation of objectors' lands, would in any manner benefit the land of these objectors.

BROWN, C.—This is a proceeding begun August 26, 1913, in the Lincoln Circuit Court, under the Act of March 24, 1913, relating to the organization of drainage districts by the circuit courts. It was instituted by the supervisors of the Elsberry Drainage District for and in behalf of said district for the purpose of extending the boundaries so as to include lands of objectors who are appellants and respondents here, and to amend the "plan of reclamation" which had been adopted by the district. The petition states that it is necessary and desirable to include these additional lands, all of which are in Pike County, because the

supervisors propose to amend the plan for reclamation already adopted so as to completely reclaim the lands in the northern end of the district by means of certain improvements, so that these lands would be greatly improved and benefited, and should be made to bear their just proportion of the burden. The main and controlling features of these improvements consist of the construction of a levee completely surrounding these lands with other lands in Pike County lately annexed to the district and called in the record the "Annada Annex." The petition states that this levee was to extend five feet above high water mark of 1858, a flood in which the river attained a height never since equaled. All the lands then included in this annex had been annexed by order of the Lincoln Circuit Court made August 8, 1912, in a proceeding which was still pending on objection to the assessment of benefits to seventeen hundred acres of the land owned by one R. C. Jefferson. The petition in that case alleged, as required by the act then in force, that the land proposed to be annexed was "a contiguous body of swamp and overflowed land contiguous to the said Elsberry District," and "that it is necessary for the complete protection of the lands now embraced in the said Elsberry Drainage District that the lands herein sought to be added to said district be embraced in said district for the purpose of having not only the lands sought to be added to said Elsberry District but also the lands in said district contained fully reclaimed and protected from the effects of water. And if said extension of the said Elsberry Drainage District is made as petitioned for herein, it will greatly increase the value of all of said lands for agricultural purposes and will largely add to the sanitary condition of the persons owning and residing on said lands."

The objectors who are here as appellants are owners of lands not included in the original Annada

Annex. Those who are respondents are the owners. of a large tract of land included in the petition for the annex, and which was, upon issue joined, adjudged not to be wet and overflowed land, and was, therefore, not included.

The Act of March 30, 1911, under which the proceeding for the original Annada Annex had been instituted and conducted, provided only for the organization into drainage districts of swamp and overflowed lands, from which class the lands of the objecting respondents were excluded by the order of August 8, 1912. At the next session of the Legislature an amendment was enacted (Laws 1913, p. 233, sec. 2) by which land "subject to overflow" was added. This act was approved March 24, 1913, and on the same day Mr. Jefferson entered into a written agreement with Harmon, chief engineer of the district on behalf of the supervisors, to the effect that his objections to the assessment were to be withdrawn on condition that the supervisors adopt a plan agreed upon for complete reclamation of the land in the annex by levee against overflow and a system of drainage shown in "plans on file." It also contained the following paragraph:

"It is further agreed that if any reductions in assessment be made between the supervisors and any parties in the annex, the assessments shall be proportionately reduced on the Jefferson lands in said annex."

In pursuance of this stipulation the objections. of Jefferson were dismissed, the present proceeding was instituted to carry it into effect, and Mr. Harmon "found a buyer" for the entire tract, and also for a. Patton tract of some eleven hundred acres. Using Mr. Harmon's own language: "Before those sales. were made, an agreement was made in this court, or

at the time that the Patton sale was made, an agreement was made in this court, with those that then owned this land that this should be done; it was a part of that stipulation or settlement with him on the other assessment. The Patton land was sold at the time and while court proceedings were pending, and the Jefferson land was sold afterwards, and it was agreed with Mr. Jefferson as a part of the settlement in this court of the previous assessments, that the entire area should be reclaimed.''

The Elsberry Drainage District was organized in the Lincoln Circuit Court on March 13, 1911, and included about twenty-five thousand acres of land, all being in Lincoln County with the exception of a strip a mile or two wide on the north end, which was in Pike County. Its north line ran westerly from a point on the west bank of the Mississippi River corresponding with the center of section 26, township 52, range 2 east, substantially along the present line of Bryant's Creek to the Chicago, Burlington & Quincy railroad near the village of Annada. About two and a half miles north of this, Ramsey Creek, another stream from the bluffs having a drainage area of about sixty square miles, flows east across the railroad into the Mississippi. It is between these streams that the land annexed, and that proposed in this proceeding to be annexed, is situated. The entire tract contains about sixty-five hundred acres and was, to a great extent, made of deposits from the overflow of Guinns Creek, a stream having a drainage area of about forty square miles, which ran all over it in an unstable channel until some twenty or thirty years ago, when it was confined to the south side of a levee built by the King's Lake Drainage & Levee District from the bluffs easterly across the railroad where it joins the present converted channel of Bryant's Creek. The village of Annada as well as the adjacent lands to the north

had. been protected by this old levee, which was adopted as a part of the enclosing levee of the annex.

Mr. Harmon now states in his testimony that the district wants to take in the land of the respondent objectors to get a better, cheaper and safer place to build the levee and ditch necessary to carry out the Jefferson agreement.

His plan of reclamation of the original district contemplated a pumping plant near Apex, ten or twelve miles from its north line, and the new scheme involves a concrete culvert two hundred feet long, by which the water is expected to be transferred from the enclosed annex, under the bed of Bryant's Creek at a depth not stated, and released into the main ditch of the company on the other side, along which it would flow twelve or thirteen miles to the contemplated pumping plant, which together with the main ditch was to be enlarged to take care of it. He states that one or more of these pumping plants, under private ownership, was already at work in the annex at the time of the trial.

The court refused in this proceeding to include in the district the lands of the respondents, J. H. and W. F. Patton, Carson E. Jamison and W. A. Richards, which had been excluded in the former proceeding, on the ground that upon the facts the previous judgment was conclusive. From this the drainage district has appealed. All the appellants whose lands are annexed to the district by the terms of the judgment appealed from, are appealing on the ground (1) that the court by its publication, which was the only notice attempted to be given the landowners, acquired no jurisdiction to impose upon such lands the burdens consequent to their annexation to the district; and, (2) that the record does not disclose facts sufficient to authorize the annexation of these lands to the drainage district under the terms of the Act of 1913, even

though the notice was sufficient to confer jurisdiction upon the court to act.

I.  While statutes providing for the reclamation of waste lands are, in some respects, highly remedial, they necessarily involve such radical interference with the control of property by the owner, and such a liberal exercise of the taxing power, as to call for the utmost care in their preparation and execution.  There is no governmental function in the exercise of which the control which ordinarily pertains to the management and preservation of one's own must be more liberally surrendered in the interest of all. On the other hand the great increase in values attending the redemption of our swamps from pestilence, and clothing them with fertility, has a tendency to excite the speculative instincts of those who wait upon opportunity to acquire property without adequate investment.  In avoiding errors incident to these conditions it is frequently found that we have committed errors even more serious than those we have escaped.  In this way it has happened that of late years the statutes relating to the formation and powers of drainage and levee districts by circuit courts have rarely survived, in their original form, the biennial legislative period in which they were enacted, and that the proceedings we are now called upon to consider have progressed for three years under as many different statutes.  It is evident that when their extraordinary powers are used in summary proceedings to place a pecuniary burden upon the property of individuals, all the conditions precedent which they prescribe should and must be complied with.  [Nishnabotna Drainage District v. Campbell, 154 Mo. 151, 157.]  This principle is clearly recognized by the Legislature, in charging these powers and duties upon constitutional courts of general jurisdiction,

Drainage District Statutes.

which can only proceed upon inquiry, and condemn after an opportunity to be heard. It is in pursuance of the same legislative policy that this record is now before us upon appeal. Our duty is to determine whether the facts which there appear authorized the relief granted by the circuit court, a question which seems to be well put by the several objections of the appellant landowners which are set out in it.

II.   The appellants contend, as we understood them, that because this jurisdiction is vested by the act in the circuit court, a judicial tribunal established by the Constitution which generally exercises its judicial functions by procedure governed by the civil code, conformity to this procedure will be implied as a prerequisite to its jurisdiction over the persons of the litigants in this case. We understand them to say that the right of the court to try the issues of fact submitted to it in this case and to render judgment thereon depends upon its judicial character conferred by the Constitution, and that the provision of the act under which it attempted to exercise that jurisdiction is void because it does not require the issue of summons to resident defendants, and does not therefore constitute due process of law within the meaning of the State and Federal Constitution.

*Sufficiency of Notice by Publication.*

We cannot agree with this proposition in its application to this case. We find nothing in these constitutions which implies that a uniform method of obtaining jurisdiction of the persons of litigants in either general or special proceedings is necessary. The Act of March 24, 1913, under which this proceeding was instituted, prescribed a method by publication which was followed, and the sufficiency of which constitutes the only question in this connection.

We said in Houck v. Little River Drainage District, 248 Mo. 373, 382, in connection with the citation of many Missouri authorities, that it was no longer open to question, ''that the State, by the Legislature, has the power to create corporations for the purpose of reclaiming or improving swamp and overflowed lands by ditches and drains and levees, in districts prescribed by it, or to be ascertained and fixed by such appropriate instrumentalities as it may provide.'' That this includes the right of the Legislature to clothe the constituted courts with jurisdiction to inquire of and determine such *judicial questions* as may arise in the course of the proceedings, and to prescribe the practice therefor is also plain. Having exercised this right by the terms of the Act of 1913; having submitted to the court all questions of law and fact involved in the determination of the question whether, under the terms of the act, the lands in question should be annexed to the Elsberry Drainage District, we will assume that a practice must be provided or made available which will enable the court to proceed in accordance with that fundamental principle of all judicial procedure which gives the parties interested in the subject of the inquiry a reasonable opportunity to be heard. The subject of this inquiry is the status of the land involved. The Legislature undertook to provide for notice to all parties interested in it by publication of notice of its pendency. We do not have to take into consideration the fact that they are all here, contending strenuously for what they conceive to be their rights, to enable us to determine that the notice provided by the act and given in this case was well calculated to the end, and we hold that it was sufficient.

III. There being actually no evidence in the record as to the plan of reclamation of the lands included in the plaintiff district other than a profile of its contemplated main ditch extending from its levee along the

south side of Bryant's Creek to its contemplated pumping station ten or twelve miles down the river, it suggests that the court will take judicial notice of its records, not only relating to the incorporation, but to all other proceedings of the company which appeared therein, all such proceedings being "in the same case." Were this true, the objectors could only come to this court with their appeal by bringing the whole mass of records accumulated from the conception of the district to the time of the trial, to show that nothing has occurred during all that time to deliver them over to their adversary. The true rule sits in sightly simplicity upon a well beaten road. The act of incorporation can only be assailed by a special plea verified as required by the code. When it has entered upon its work as a *quasi*-municipal corporation it becomes immune against collateral attack. With respect to the assertion of its legal rights, it stands no higher than an individual, so that its mere existence does not prove its causes of action against strangers having no connection with its creation, but it must prove them by competent evidence by which its adversary is bound. We must find the right of the plaintiff to have the relief it is seeking, in the record of the trial before us.

*Drainage District: Judicial Notice of Plan of Reclamation.*

IV. The objectors deny that there is any reason why their lands should be made a part of the Elsberry Drainage District, and say that the execution of its plan of reclamation would in no way affect the lands sought to be annexed, and that no scheme of drainage proposed for such lands would affect the Elsberry Drainage District. In short, they plead, in substance, that there is no connection whatever between the levee and and drainage conditions affecting the Elsberry Drainage District and those affecting the lands sought to

*Extending District to Include Lands Not Benefited.*

be annexed to it, and that the owners of the former ought not to be permitted to meddle in the affairs of their neighbors in which they have no legitimate concern. In support of their position they point to the statute under which this district was organized, which fairly represents the general legislative policy of the State on the subject (article 1, chapter 41, R. S. 1909), and direct our attention to the fact that it required that the district to be organized should consist of a "contiguous body of swamp or overflowed lands," and that a majority in interest of the owners should unite in its formation. [R. S. 1909, sec. 5496.] We find no suggestion in this or any of these laws that if the majority in interest in any such body of lands should fail to agree to the formation of a drainage district, a coterie of them might form a little district of their own, from which they could reach out and take in their recalcitrant neighbors, through the assistance of the courts, extended for the mere asking. This proposition is too absurd to be considered seriously. The submission of these questions to the courts implies that they are to be determined according to those fixed rules of construction and determination which are unfailing characteristics of all judicial action. In the recent case of Squaw Creek Drainage District v. Turney, 235 Mo. 80, 95 et seq., we examined this question at length, and arrived at the conclusion that while the policy of this statute was that schemes of this character must be inaugurated by the owners of the lands requiring the improvement, the right to extend the limits of the district so as to include other lands of like character was given to meet cases in which there is something in the character or situation of the lands to be annexed, or the nature of the contemplated improvement, which would enable them to share in the benefit of the work without contributing to the cost, or would otherwise make it inequitable to withhold

their assistance. It is particularly noticeable that
there is nothing in the law under which the plaintiff
was organized, nor in the Act of 1913 under which this
proceeding was brought, which authorized the inclu-
sion, by extension, of any lands not of the character en-
titling them to be included in its organization. While
the fullest authority was given (Laws 1911, p. 232, sec.
5704a) to construct and maintain ditches, canals,
levees, dams, sluices, reservoirs, holding basins, flow-
ways, pumping stations and any other improvements
in or out of the district, necessary to the reclamation of
the land within the district, it had no power to include
in the district any lands for that purpose other than
such as needed reclamation and protection from wa-
ter. Its powers were ample to acquire lands for these
purposes by purchase or condemnation, but not under
pretense of subjecting it to any part of the burden of
an improvement of which it was not susceptible and
which it did not need.

It follows that the question before the circuit
court in this case was whether, in accordance with the
principles we have just stated, the Elsberry Drainage
District was entitled, against the will and protest of
the owners, to annex these lands; and we hold that un-
less there was some common interest between them, by
reason of which the improvement of the district would
affect beneficially those of the objectors, the right did
not exist. We use the word beneficially because we
can find nothing in these acts expressive of a legisla-
tive intent to provide for the annexation of other
swamp or overflowed lands as a substitute for their
appropriation by condemnation, and that such an act
would be a taking of the land for the purpose of the
improvement without compensation being first paid.
Section 9 of the Act of 1913 (Laws 1913, p. 237) neces-
sarily calls for this construction. It provides that im-
mediately upon the appointment of the chief engineer

he "shall make all necessary surveys of the lands within the boundary lines of said district, as described by the articles of association, *and of all lands adjacent thereto that may or will be improved or reclaimed in part or in whole by any system of drainage or levees that may be outlined and adopted,*" and that his "report shall contain a plan for drainage, leveeing and reclaiming the lands and property described in the articles of association *or adjacent thereto from overflow or damage by water.*" The improvement or reclamation of these adjoining lands is the only purpose for which the district is authorized to meddle with them.

V. Although, as we have already said, statutes of this character should be liberally construed to the end that the public benefit contemplated by the Legislature be not defeated, it is equally important that this beneficent purpose should not, by construction, be made a vehicle of private greed or undue personal advantage. The facts of this case indicate that we should come to its consideration with both these suggestions well in mind.

Facts of Case.

The purpose of the plaintiff corporation seems to have been the reclamation from water of about twenty-five thousand acres of Mississippi River bottom lands lying between the Chicago, Burlington & Quincy Railroad and the river, and south of Bryant's Creek in Pike County. The record is obscure as to the particulars of its incorporation, and its subsequent proceedings, and we resort to the admission of counsel in printed argument, and such fragmentary evidence as bears upon these subjects, for the meager details of which we are able to avail ourselves. One thing, however, is made plain. The lands of the Elsberry Drainage District were isolated from the lands lying north of it by Bryant's Creek. It is also plain that its plan of reclamation involved the straightening of this

stream and the construction of a levee along the south side of the converted channel, of such height and strength as to protect the district by turning back its flood waters upon these lands to the north. It does not plainly appear how any plan for the drainage and improvement of the district could benefit or improve the lands lying north of this stream, and the owners of the latter exhibited no desire to join in the enterprise. Notwithstanding this the new district, on May 4, 1912, presented its petition to the Lincoln Circuit Court to have about five thousand acres of this land attached to it, stating that it was necessary to the complete protection from the effects of water, of the lands already embraced in the district, as well as that sought to be added. Neither the plan for doing this nor the nature of the mutual interest requiring it was referred to. Among the lands involved in that proceeding was about seven hundred acres belonging to Carson E. Jamison, W. A. Richards and J. H. and F. W. Patton. J. H. Patton is now dead and his former interest is represented in this suit by Lottie Patton Harris, his sole heir. These owners objected to the inclusion of their lands, asserting that they were neither swamp nor overflowed. An issue was made upon this question, which was tried and found for said owners, and the court adjudged that the lands were not wet or overflowed, and excluded them, and, on August 8, 1912, entered its decree annexing the other lands described in the petition. The owners of the lands so excluded are pleading that judgment as an adjudication of the same question in this case. This plea was sustained by the court, and its action in this respect affords the ground of plaintiff's appeal.

VI. About seventeen hundred acres, being more than one-third of all the lands annexed in the proceeding referred to in the last paragraph, were then owned by one R. C. Jefferson. That these were swamp and

overflowed lands badly in need of reclamation is evi-
**Further.** dent. Proceedings were immediately tak-
**Facts of Case.** en to assess the benefits to the land includ-
ed. Mr. Jefferson was dissatisfied with the assessment
as to his own land and formally objected thereto and
the cause was continued upon his objection until set-
tled by the agreement to which we shall presently refer.

Upon the incorporation of the Elsberry Drainage
District Jacob A. Harmon of Peoria, Illinois, was ap-
pointed its chief engineer. He was a civil engineer of
twenty-five years experience, engaged in drainage
work, in which he was an expert, and in addition to
his professional employment sometimes found pur-
chasers for lands of the character to which his activi-
ties were directed. In that character and during these
proceedings, he found purchasers for the seventeen
hundred acres owned by Mr. Jefferson and eleven hun-
dred acres owned by one or more of the Pattons.
These tracts included the greater part of the land in
the annex.

The Elsberry peeple were not discouraged by
their failure to obtain all they wanted in the proceed-
ing from which Jamison, Richards and the Pattons
had escaped. By a fortunate coincidence the next.
Legislature enacted a new law on the subject (Laws
1913, p. 232). The law in force during the previous
proceedings had only provided for the organization in-
to such districts of "swamp or overflowed lands."
The new act (Laws 1913, p. 233, sec. 2) added the
words "or lands subject to overflow," so that the
loophole through which they had escaped was closed.
The Elsberry people quickly took notice of this. The
bill contained an emergency clause (Laws 1913, p. 267,
sec. 63) and was approved March 24, 1913. On the
same day Mr. Jefferson entered into a written agree-
ment with Mr. Harmon, representing the supervisors of
the Elsberry District, by the terms of which his objec-

tions were to be withdrawn on condition that assessments for the work should not cost more than thirty per cent. of the benefits assessed. It provided that the supervisors should adopt a plan for the complete reclamation of the lands in the annex by levee against overflow and a system of drainage constructed to an outlet into the system of drains to the pumping plant, and that if any reductions in assessment be made between the supervisors and any parties in the annex, the asessment should be proportionately reduced on the Jefferson lands. There were other stipulations which, in the view we take of its effect, need not be noticed. On August 22, 1913, the supervisors commenced this proceeding to extend the boundaries of the district and amend its "plan for reclamation."

Mr. Harmon, who seems to have been the moving spirit in the affairs of the Elsberry District and especially in those matters connected with the improvement of the Jefferson lands, as well as its principal witness in this case, states in his testimony that it was agreed with Mr. Jefferson as a part of the settlement of the assessment against his land "that the entire area should be reclaimed;" "that that would be a protection, a complete protection and reclamation of the Jefferson lands;" "that in accordance with the plan he had made these surveys for the Elsberry Drainage District to protect that land and that is the reason why it is being done." We have here an authoritative statement which can mean nothing less than that this proceeding was instituted under an agreement with a single owner to improve his lands upon the plan made by the agent who found a purchaser for them, and for a consideration moving entirely from that owner in the withdrawal of his objections to an assessment made against him. It is also in proof by the same witness, and like his other statements to which we have referred, undisputed, that the "plan of reclamation"

made in accordance with the agreement could be accomplished more cheaply by the use of the lands excluded from the district in the former proceeding, excluded because they did not meet the description of "swamp or overflowed lands." It was here that the Act of 1913 played its part in the transaction. In 1858 there had occurred an overflow of waters of the Mississippi River which has never since been duplicated, but which overflowed these same lands. They were therefore "subject to overflow" so that the plan for reclamation adopted and set out in the petition contained the following statement: "The top or grade line of the levee will be five feet above high water of 1858." The petitioner is now insisting that in the former proceeding for the annexation of this land the question as to whether or not it was subject to overflow was not and could not have been tried, because the law making that a ground for including it in the drainage district had not yet been enacted.

In the plan of reclamation presented by the petition in this case the petitioner for the first time attempts to show how the lands north of Bryant's Creek will be benefited by attaching them to the Elsberry District. It presents a scheme by which the water that accumulates either from local rain or overflow, are to be gathered to the lowest point of the proposed levee on the north side of that stream, and then through a concrete culvert two hundred feet long passing under its bed, then up into the main ditch of the district which is to be enlarged to take care of it, to the proposed pumping station at Apex, which is in turn to be enlarged to raise it over the levee and into the river. This is an interesting plan, but we are not called upon to compare its utility with the more simple one of pumping it into the river from the land upon which it accumulates.

VII. We have already said in a preceding paragraph that to authorize a drainage district organized under these acts to extend its limits over other lands without the consent of the owners, the lands of the district and those to be annexed must bear such a relation to each other that the proposed improvement will be of mutual benefit. A district has no right, either to go outside the object of its organization to force upon its neighbor an improvement in which he has no interest, or to compel its neighbor to improve his own land without receiving some benefit to compensate him for the outlay.

Looking at this proceeding in the light of these principles we are confronted with the difficulties in finding a reason to support it. Its object is to surround sixty-five hundred acres of land disconnected from that for the improvement of which the petitioner was incorporated, with a levee so high and strong as to render it immune from the effects of a repetition of a flood which occurred more than fifty-five years ago, and, by the complicated arrangement described in its plan, to turn loose on its land all the surplus water which may accumulate in this vast enclosure, enlarging its own ditches and pumps to take care of it. We may realize, to some extent, the magnitude of this last work from the profile of its main ditch to be enlarged for that purpose. It shows this ditch to be more than twelve miles long from the pumping station near Apex to the place where it would catch this water as it emerges from the ground beneath the bed of the stream and the levee intended to confine it. We have nothing in the record showing the cost of this work of enlargement, but considered as a disinterested act of charity it would be considerable.

We are not unmindful of the fact that before the beginning of this proceeding the larger part of this territory had been annexed to the Elsberry District

by a judgment of the court from which no appeal was taken. That this judgment is binding we do not question, so that for all the purposes of this case we must consider the boundaries of the district as affected by its terms and the mutual interest of the parties as founded upon the lines of division which it establishes. We have examined at length the rights of the parties to this controversy as they existed at the time of the incorporation of plaintiff, because we think the evidence tends to show that the subsequent proceedings for the annexation of territory were in pursuance of a general plan or motive which is the controlling factor of this case.

That Mr. Harmon had great influence in the affairs of the Elsberry District is shown conclusively in this record. That he was not averse, notwithstanding his official connection with the enterprise, to involving himself in its financial possibilities appears from the fact that during the progress of these proceedings he found purchasers for more than one-half the land included in the original annex, so that it is fair to say that in addition to his official compensation for the work done by him he shared in the first fruits of that enterprise. The largest item of this participation related to the sale of the Jefferson tract which comprised more than one-third of the land annexed in the first proceeding. This sale was made after the decree for the annexation of the land had been entered and in contemplation of all the resulting benefits and profits.

There is nothing in the record to indicate whether it was Mr. Harmon or Mr. Jefferson or both of them together, that first conceived the idea of the contract prepared and signed by both, which embodied the final word fixing the favorable terms upon which the Jefferson land was to be admitted to the benefits of the improvement, limiting the amount of the cost that was

to be charged against it, and providing that the supervisor should adopt for its benefit a plan for complete reclamation of all the land in the annex by levee against overflow and a system of drains constructed to an outlet to the pumping plant. That the plan presented in this petition is the plan for reclamation referred to in the contract is evident and that this contract contemplated the bringing of this proceeding is equally evident. Both the contract and the petition described it with equal certainty, although with different degrees of particularity. That this proceeding was instituted solely for the performance of that contract is practically admitted in the evidence.

Whether under the Act of 1913, a drainage district may extend its limits for the purpose and under the circumstances we have stated is the question before us. The authors of the plan and the petitioner by its evidence frankly admit that the object of the extension is to carry out the terms of the Harmon-Jefferson agreement that the petitioner will reclaim the lands of the latter, principally at the cost of protesting neighbors, who are shown by the evidence to be amply able to take care of their own.

These corporations are clothed by the State with governmental functions, including taxation and eminent domain, because the development in productiveness of the lands of the State and the promotion of the health and comfort of the people are matters of governmental concern, which are to be exercised only for the benefit of the public. The drainage district in these respects are agencies of the State, and it is not necessary to say that they have no more power to levy a tax to aid a purely private enterprise than would the State itself. The very fact that they are clothed with these extraordinary powers imposes upon the courts in the exercise of their jurisdiction, the duty of watchful-

267 Mo. 11

ness to see that such powers are not prostituted to the purposes of private speculation. By the terms of the act (section 17) the chief engineer was made superintendent of all the works and improvements, and the special adviser of the board, and while we do not think it necessary to condemn Mr. Harmon for his participation in the sale of lands that must depend largely for their value on his own advice, we think the court should take the fact into its consideration in determining whether the motive of this proceeding was a public or private one.

For the reasons stated in this paragraph we think the court erred in extending the limits of the plaintiff district to include the lands of the objectors upon the evidence before it. For this reason the judgment will be reversed so far as it includes in the Elsberry Drainage District the lands of the appellant objectors, and affirmed as to the respondent objectors, and the cause is remanded with directions to the circuit court to proceed to final judgment in accordance with the principles stated in this opinion.

*Railey, C.,* concurs.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All of the judges concur.